**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JACOB S. WARD, *Plaintiff,* <br><br> v. <br><br> AMAZON.COM SERVICES, LLC, *Defendant.* | No. 3:24-cv-01451 (VAB) |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Jacob S. Ward ("Plaintiff" or "Mr. Ward") brings six claims: (1) gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; (2) gender harassment under Title VII; (3) retaliation under Title VII; (4) gender discrimination under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.*; (5) sexual orientation harassment under CFEPA; and (6) retaliation under CFEPA. *See* Compl., ECF No. 1 ("Compl.").

Amazon.com Services, LLC ("Defendant" or "Amazon") has filed a motion for summary judgment as to the claims against it. Mot. for Summ. J., ECF No. 22.

For the following reasons, Amazon's motion for summary judgment is **GRANTED**.

The Title VII claims are dismissed with prejudice, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims, dismissing them without prejudice to refiling in state court.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

On November 27, 2020, Amazon hired Jacob Ward as an Onsite Medical Representative at its LEX2 facility in Lexington, Kentucky. Pl.'s SMF ¶ 9. According to the Unpaid Time

Policy ("UPT Policy"), Mr. Ward was issued ten hours of unpaid time at the outset of his employment and thereafter accrued eight hours per month. *Id.* ¶ 10. Mr. Ward was aware at the time he was hired that Amazon could terminate his employment for violating its attendance policies. *Id.* ¶ 11.

In May 2022, Mr. Ward applied for and was approved for a transfer to an Onsite Medical Representative position at BDL4, a new Amazon facility scheduled to open in Windsor, Connecticut. *Id.* ¶¶ 13-14. Hiring Manager Kathy O'Connell, the Warehouse Safety Manager, approved the transfer and set an effective start date of June 12, 2022. *Id.* ¶ 14. At BDL4, Ms. O'Connell supervised Michelle Zadrozny, another Warehouse Safety Manager, who in turn directly supervised Mr. Ward. *Id.* ¶ 15.

BDL4 officially opened in October 2022. *Id.* ¶ 19. Before BDL4's opening, Mr. Ward and other members of the BDL4 medical team completed short-term assignments ("STAs") at Amazon's CLE3 facility in Cleveland, Ohio from July to August 2022, and at BDL2 in Windsor, Connecticut from September to October 2022. *Id.* ¶¶ 16-18. Ms. O'Connell and Ms. Zadrozny also participated in the STA at CLE3. *Id.* ¶ 17. Mr. Ward testified that he had a "pretty healthy" relationship with Ms. Zadrozny, but that his relationship with Ms. O'Connell deteriorated once BDL4 opened. *Id.* ¶ 20. Mr. Ward attributed this change to Ms. O'Connell developing her relationship with senior leadership at the site. *Id.* ¶ 21.

Amazon maintains an equal employment opportunity policy prohibiting discrimination on the basis of gender, sexual orientation, and all other legally protected characteristics. *Id.* ¶¶ 1-2. Amazon also maintains a workplace harassment policy prohibiting "[s]tatements or actions that offend or demean a person based on" protected characteristics, including gender and sexual orientation. *Id.* ¶ 4. In addition, Amazon maintains an Attendance and Punctuality Policy and an

Unpaid Time Policy. *Id.* ¶ 5. According to the Attendance and Punctuality Policy, employees are expected to work their scheduled hours, and unsatisfactory attendance may result in disciplinary action up to and including termination. *Id.* ¶ 6. The UPT Policy allows an employee to accrue and use their unpaid time to cover unexpected absences, in addition to paid time off. *Id.* ¶ 7. The UPT Policy also states that a negative unpaid time balance constitutes a violation of Amazon's attendance policies and can lead to termination if not resolved. *Id.* ¶¶ 8, 32. Mr. Ward alleges that Amazon's Standard of Conduct Policy classifies time and attendance violations as Category Two infractions, which "generally result in corrective action" rather than termination. *Id.* at 17, ¶¶ 13-16. Amazon alleges that, absent unusual circumstances, its practice is to terminate employees who carry negative UPT balances. *Id.* ¶ 70.

Mr. Ward's weekly schedule was available to him through Amazon's A to Z Application. *Id.* ¶ 22. Mr. Ward has admitted that he did not appear for all of his scheduled shifts. *Id.* ¶ 23.

In or around July 2022, Mr. Ward changed his pronouns to "it/they" on Amazon's internal systems. *Id.* ¶ 54.

In or around August and September 2022, Ms. O'Connell asked Plaintiff two or three times whether he was dating a female coworker on the medical team. *Id.* ¶ 57; *id.* ¶¶ 17-19. After the third inquiry, Mr. Ward told Ms. O'Connell he was "getting uncomfortable" with these questions. *Id.* ¶ 58; *id.* at 17, ¶ 18. Mr. Ward alleges that, rather than ceasing the inquiries entirely, Ms. O'Connell subsequently directed Ms. Zadrozny to ask him about the relationship, which he also objected to in October 2022. *Id.* ¶ 58; *id.* at 17, ¶¶ 21-22.

Ms. O'Connell testified that she asked about the relationship to ensure HR procedures for disclosing workplace relationships were being followed. *Id.* ¶¶ 60, 65. Mr. Ward alleges that by asking if he was in a relationship with a female employee, Ms. O'Connell was actually

questioning his sexual orientation, though he concedes that Ms. O'Connell never directly asked about his sexual orientation. *Id.* ¶¶ 72-74.

In or around September 2022, Ms. O'Connell asked him about his "it/they" pronoun designation twice. *Id.* ¶¶ 54-55. Mr. Ward alleges that she later inquired about his pronouns with other safety team employees and told Plaintiff that members of senior leadership were discussing his pronoun designation. *Id.* at 17, ¶ 23.

Ms. O'Connell has admitted that she asked the Plaintiff about his pronouns, but states she did so because she was concerned that he may have changed his pronouns as a joke and did not want him to get in trouble. *Id.* ¶¶ 62-64. She testified that she thought he might be joking because Mr. Ward had previously allegedly made an "off-color" joke about the LGBTQ+ community, and she feared he was putting himself at risk for inappropriate behavior. *Id.* ¶ 64. Apart from Ms. O'Connell's two inquiries, Mr. Ward was not aware of anyone else at Amazon who made comments about his gender or sexual orientation. *Id.* ¶ 56.

On September 21, 2022, Mr. Ward did not report to work, though he alleges having been accidentally scheduled to work on that day. *Id.* ¶ 24. Despite this alleged misunderstanding, the parties agree that Mr. Ward's unpaid time balance would still have been negative in October 2022. Pl.'s SMF ¶ 27. As of October 8, 2022, Mr. Ward had a negative unpaid time balance of -2.22 hours. *Id.* ¶ 28. On October 20, 2022, his unpaid time balance reached its lowest point of -11.89 hours. *Id.* ¶ 30. Amazon alerted Plaintiff on his pay records that his unpaid time balance was negative. *Id.* ¶ 29.

On October 20, 2022, Mr. Ward spoke with Amazon's on-site Human Resources ("HR") regarding his negative unpaid time balance, and stated it was negative because of the September 21, 2022 shift, which he maintains was scheduled accidentally. *Id.* ¶ 31.

On October 23, 2022, Amazon's centralized HR, which monitors negative unpaid time and operates independently of on-site HR, contacted Mr. Ward by e-mail to notify him about his negative balance and warned that it "can lead to termination if not resolved." *Id.* ¶ 32. Mr. Ward responded the same day and claimed that his negative unpaid time "was from a [sic] accidental scheduled day, and from a week of hardship of being late a couple of times." *Id.* ¶ 33. Amazon's centralized HR directed Mr. Ward to speak with on-site HR on his next scheduled shift, October 27, 2022, to reconcile his unpaid balance. *Id.* ¶ 35. In accordance with its attendance policies, Amazon reviewed Mr. Ward's ongoing attendance violations in late October 2022. *Id.* ¶ 36.

On October 27, 2022, after HR alerted Ms. O'Connell that Mr. Ward's employment would be terminated for his negative unpaid time balance, Ms. O'Connell messaged HR stating: "I vote for final written" rather than termination. *Id.* ¶ 37. Despite Ms. O'Connell's recommendation, Mr. Ward was terminated effective November 4, 2022. *Id.* ¶¶ 38, 40. Mr. Ward alleges he received no verbal coaching or written warnings about his attendance prior to his termination. *Id.* at 17, ¶¶ 1-2.

On November 13, 2022, Mr. Ward appealed his termination to Amazon. *Id.* ¶ 42. In his appeal, he wrote that he was "late multiple times" which resulted in approximately six hours of unpaid time being taken to cover his absences. *Id.* ¶ 43. This made him "approximately 15 hours negative because the wrongly scheduled day (9/21) still hadn't been fixed." *Id.* He then sought reinstatement, stating he had not realized he was "up for" termination. *Id.* ¶ 44. On November 18, 2022, Mr. Ward attended an appeal hearing with Senior Site Leader Paul Collins. *Id.* ¶ 45. On November 21, 2022, Amazon notified him that his termination was upheld, finding that "all policies were applied properly and consistently." *Id.* ¶ 46.

On December 4, 2022, approximately one month after his termination and following the conclusion of his appeal, Mr. Ward filed a complaint with Amazon against Ms. O'Connell. *Id.* ¶ 49. In that complaint, he alleged that Ms. O'Connell had retaliated against him by failing to adjust his unpaid time, and that she had discriminated against him by asking about his pronouns and whether he was dating a female coworker. *Id.* ¶ 49. The parties agree that Ms. O'Connell played no role in adjudicating Plaintiff's appeal. *Id.* ¶¶ 47-48.

The parties dispute whether the Plaintiff formally complained about Ms. O'Connell before his termination. Amazon asserts that he never complained about Ms. O'Connell until he filed a complaint on December 4, 2022. *Id.* ¶ 52. Mr. Ward alleges that he informally objected by telling Ms. O'Connell directly to stop asking about his relationship with the female coworker. *Id.* ¶ 52; *id.* at 17, ¶ 20. In investigating the Plaintiff's December 4, 2022 complaint, Amazon substantiated that Ms. O'Connell asked Plaintiff about his pronouns and his relationship with the female coworker, and Amazon terminated Ms. O'Connell's employment on January 11, 2023. *Id.* ¶ 66. The investigation found that the Plaintiff's retaliation claim was unsubstantiated, noting that Ms. O'Connell had, in fact, advocated for a lesser disciplinary measure (a final written warning) rather than termination. *Id.* ¶¶ 53, 69.

Mr. Ward alleges that another co-worker held a similarly situated position as Safety Specialist, worked on the same team under Ms. O'Connell's supervision, was subject to the same rules and policies, incurred a negative unpaid time balance under comparable circumstances, but was not terminated. *Id.* at 17, ¶¶ 4-8, 12. In light of this alleged differential treatment, Mr. Ward alleges that his termination was discriminatory in nature. *Id.* ¶ 68; *id.* at 17, ¶¶ 3-12.

6

### B. Procedural History

On September 10, 2024, Mr. Ward filed a Complaint against Amazon. Compl., ECF No. 1. On October 4, 2024, Amazon filed its Answer with affirmative and special defenses. Answer, ECF No. 11.

On November 17, 2025, Amazon filed a motion for summary judgment and an accompanying memorandum of law. Mot. for Summ. J., ECF No. 22; Mem. in Support of Mot. for Summ. J., ECF No. 23 ("Mot."). The same day, Amazon filed a statement of material facts. Deft.'s Statement of Material Facts, ECF No. 24 ("Deft.'s SMF").

On December 23, 2025, Mr. Ward filed an objection to the motion for summary judgment. Obj., ECF No. 28 ("Obj.").

On January 13, 2026, Amazon filed its reply. Reply, ECF No. 31 ("Reply").

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of

material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

Mr. Ward has brought claims under Title VII and CFEPA alleging gender discrimination, harassment and hostile work environment, and retaliation.

The Court addresses the federal claims first, and if necessary, the supplemental state law claims.

### A.  The Title VII Claim

Under Title VII, to continue past summary judgment on a gender discrimination claim, a plaintiff must establish a *prima facie* case of discrimination. *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014) ("Under *McDonnell Douglas* [*Corp. v. Green,* 411 U.S. 792 (1973)], a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination . . . ."). A *prima facie* case requires that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse employment action; and (4) that action "occurred under circumstances giving rise to an inference of discriminatory intent." *Abrams*, 764 F.3d at 251–52.

Once a plaintiff has satisfied this burden, "it is then the defendant's burden to proffer a legitimate nondiscriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Id.* at 251.

Amazon argues that Mr. Ward's gender discrimination claims fail for two reasons. First, Amazon argues that Mr. Ward cannot establish that his termination occurred under

circumstances giving rise to an inference of discriminatory intent on the basis of gender. Rather, the termination occurred under "unremarkable circumstances" related to the violation of Amazon's attendance policies. Mot. at 11. And Ms. O'Connell, against whom the claims are asserted, had no authority to impose an adverse employment action, nor did she so desire, since "when she learned HR planned to terminate Plaintiff's employment for negative UPT she 'voted' for a final written warning instead." *Id.* Amazon argues that Ms. O'Connell's inquiries into Mr. Ward's pronouns were "stray workplace remarks" that are "entirely separate from Amazon's legitimate, non-discriminatory business decision to terminate Plaintiff's employment for failing to comply with its attendance policy." *Id.* at 13.

Second, Amazon argues that "even if [Mr. Ward] could establish a *prima facie* case of gender discrimination, he cannot prove that Amazon's articulated non-discriminatory business reason for firing him," namely that Mr. Ward's violations of the attendance policies, "was a pretext for a discriminatory motive." *Id.* In support of this argument, Amazon points to the repeated warnings Mr. Ward received as well as HR's "consistent application of Amazon's policies and practices in responding to attendance issues[.]" *Id.*

Mr. Ward responds that Ms. O'Connell's actions — repeated questioning of the Plaintiff's pronouns and of his relationship with a female co-worker — constitute sufficient circumstantial evidence of gender stereotyping, and consequently sex discrimination. Obj. at 13. Next, Mr. Ward argues that the Defendant's deviation from its Standard of Conduct policy, which suggests corrective action instead of termination for time and attendance infractions, shows that Amazon's non-discriminatory reason for termination was pretextual. *Id.* at 15-16. And because Mr. Ward did not learn of his growing UPT balance until his termination, he argues that he received neither notice of his infractions nor an opportunity to address them. *Id.* Finally,

10

Mr. Ward argues that Amazon's differential treatment of Mr. Chidester, a similarly situated employee, supports a finding of pretext. *Id.* at 16-17.

Amazon replies that Mr. Ward's claims must ultimately fail because Ms. O'Connell was neither a decisionmaker nor in favor of terminating Mr. Ward for his negative UPT balance. Reply at 1. Thus, Ms. O'Connell's allegedly discriminatory actions had no influence on HR's ultimate decision to terminate Mr. Ward over Ms. O'Connell's objection. *Id.* at 2. Amazon also notes that undisputed business records show that Mr. Chidester never had a negative UPT balance and is therefore an "inapt comparator" who does not establish that Mr. Ward was discriminated against. *Id.* Finally, Amazon argues that it "terminated Plaintiff's employment consistent with its typical practices," which is not evidence of pretext.

Specifically, Amazon notes that while its attendance policy does not require it to issue a warning following unsatisfactory attendance, it nonetheless did warn Mr. Ward by e-mail, and "Amazon's practice is to terminate employees when they continue to carry negative UPT balances despite HR's outreach." *Id.* at 3-4. Therefore, Amazon argues that its compliance with its policies and typical practices is not evidence of pretext. *Id.* at 4.

The Court agrees.

For purposes of its analysis, the Court will assume without definitively deciding that Mr. Ward can make out a *prima facie* case, and address whether Amazon's proffered legitimate nondiscriminatory reason for the termination "is in fact a pretext for unlawful discrimination." *Abrams*, 764 F.3d at 251; *see id.* at 252 ("The district court . . . avoided resolving the matter conclusively because it determined that even had [Plaintiff] made out a prima facie case, he could not establish pretext at the final stage of the *McDonnell Douglas* analysis."). The answer is no.

11

On this record, there is no genuine issue of fact that violation of Amazon's attendance policies could result in termination. Under Amazon's attendance and punctuality policy, it is undisputed that "unsatisfactory attendance may be a basis for disciplinary action, up to and including dismissal." Pl.'s SMF ¶ 6 (citing Exhibit 3, the Amazon Attendance and Punctuality Policy). It also is undisputed that a negative unpaid time balance ("UPT") will result in Amazon "review[ing] your employment in accordance with its attendance policies." *Id.* ¶ 8 (citing Amazon's Attendance UPT Policy). It is further undisputed that Mr. Ward knew "when he started working at Amazon the Company could terminate his employment for violating Amazon's attendance policies." *Id.* ¶ 11 (citing Mr. Ward's deposition testimony).

On this record, there also is no genuine issue of fact that Mr. Ward had a negative unpaid time balance with Amazon in October of 2022, in violation of Amazon's attendance and punctuality policy. Indeed, even if Amazon gave Mr. Ward credit for September 21, 2022, when he claims he had been "accidentally scheduled," *id.* ¶ 27, he still would have had a negative unpaid time balance going into October of 2022. *Id.* (quoting Mr. Ward's deposition testimony: "Q. And so, even if we remove that – the ten hours from that shift [on September 21, 2022] you still would have been negative at that point, is that right? A. Yeah.").

Moreover, it is undisputed Mr. Ward had been notified by Amazon of his negative unpaid time balance, and further informed that he had to correct the situation. On October 8, 2022, "Amazon alerted Plaintiff on his pay records that his UPT balance was negative." *Id.* ¶ 29. Amazon then later "contacted Plaintiff by email on October 23, 2022 to alert him further to his negative UPT balance, writing: As a reminder, a negative UPT balance [ ] is considered a violation of our attendance policy, and can lead to termination if not resolved." *Id.* ¶ 32 (citations omitted). The very next day, October 24, 2022, in response to Mr. Ward, Amazon reminded him

12

that action had to be taken to resolve the negative unpaid time balance. *Id.* ¶ 35 (citations omitted).

Then, on October 27, 2022, Amazon informed Ms. O'Connell, who supervised Mr. Ward's supervisor, of a decision to terminate Mr. Ward because of his negative unpaid time balance. *Id.* ¶ 37. While Ms. O'Connell urged Amazon to instead issue a final written warning, *id.*, it is undisputed that "the decisionmakers, Regional Safety Manager, Safety HR, Site HR Manager, and Site [Senior Human Resources Business Partner], proceeded with termination in accordance with Amazon's policies and practices for responding to attendance violations like Plaintiff's." *Id.* ¶ 38 (citing the deposition of Jaime Guzman, Site Senior Human Resources Business Partner). Amazon then terminated Mr. Ward on November 4, 2022. *Id.* ¶ 40.

Despite all of these undisputed facts — facts Mr. Ward concedes are true — he argues nonetheless that his termination was a pretext for Ms. O'Connell's allegedly discriminatory remarks, as evidenced by an alleged comparator, Michael Chidester, and that he should have received a written warning, rather than be terminated. None of these arguments, however, create, much less suggest, a genuine issue of material fact to be tried here.

First, as to Ms. O'Connell's alleged comments, there is nothing in this record from which a reasonable jury could infer that they played any role in his termination. As noted above, it is undisputed who the "decisionmakers" were: Amazon's Regional Safety Manager, Amazon's Safety Human Resources, Amazon's Site Human Resources Manager, and Amazon's Site Senior Human Resources Business Partner. *Id.* ¶ 38 (responding to this statement of fact as "Admitted"). Even more importantly, the undisputed facts indicate that Ms. O'Connell opposed, not supported, Mr. Ward's termination. *See id.* ¶¶ 37-38 (citing Ms. O'Connell as "writing: I vote for final written" instead of termination."). Thus, regardless of what she might have said

13

about or to Mr. Ward, there is nothing in this record to suggest that her views of or comments about him played any role in his termination. *See Desrosiers v. Summit Sec. Servs., Inc.*, No. 21-CV-10941 (JPO), 2022 WL 13808524, at *4 (S.D.N.Y. Oct. 21, 2022) ("Desrosiers's failure to allege that Hackett was the relevant decisionmaker in Desrosiers's termination strongly weighs against considering the alleged comments Hackett made as to Desrosiers's national origin to be evidence of discriminatory motivation in Desrosiers's termination."); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (allowing a Title VII plaintiff "to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker so long as the individual shown to have the impermissible bias played a meaningful role . . . in the process") (citation and internal quotation marks omitted).

In any event, in order to determine whether her comments were "stray remarks" or are circumstantial evidence of discriminatory intent, courts in this Circuit consider four factors, none of which are dispositive: "(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010).

As to the first factor, and as discussed above, while Ms. O'Connell supervised Ms. Zadrozny, who in turn directly supervised Mr. Ward, Pl.'s SMF ¶ 15, and formed part of site management, she had no decision-making authority over Mr. Ward's employment, retention, or termination, nor over the appeal of his termination.[1] *Id.* ¶¶ 32, 41, 48. Because she played no role

---

[1] While Mr. Ward speculates that Ms. O'Connell made the decision to terminate his employment, as discussed

in Mr. Ward's termination or in adjudicating the appeal of his termination, these comments were "not directly related to the adverse action against the plaintiff." *Henry*, 616 F.3d at 150.

As to the second factor, Ms. O'Connell's remarks were made in or around August and September 2022. Pl.'s SMF ¶¶ 54, 57. HR first contacted Mr. Ward by e-mail to alert him to his negative UPT balance on October 23, 2022, and his employment was terminated effective November 4, 2022. *Id.* ¶¶ 32, 40. While the relative proximity between Ms. O'Connell's remarks and Mr. Ward's subsequent termination may ordinarily be probative of discriminatory intent, her lack of involvement in the termination decision makes any such probative value, very limited at best, if not otherwise inadmissible because of its potentially prejudicial effect. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage."); Fed. R. Civ. P. 56(c)(2) (evidence submitted in support of a motion for summary judgment may be struck if inadmissible); *Pacenza v. IBM Corp.*, 363 Fed.Appx. 128, 130 (2d Cir. 2010) (noting that the Court "is obliged not to consider inadmissible evidence at the summary judgment stage [and] it remains in that court's discretion whether to strike the inadmissible portions or simply disregard them."); *see also Wanamaker v. Town of Westport Bd. of Educ.*, No. 3:11-CV-1791 (MPS) (WIG), 2013 WL 3816592, at *1 (D. Conn. July 22, 2013) (noting that "a court may only consider admissible evidence when ruling on a motion for summary judgment") (citation omitted).

---

above, there is no record evidence to support this assertion. *See* Pl.'s SMF ¶ 41; *see also* Decl. of Jaime Guzman, ECF No. 31-1 ¶ 14.

15

As to the third factor, whether a reasonable juror could view the remarks as discriminatory, on this record, the remarks about the Plaintiff's listed pronouns and alleged romantic relationship suggest concern as to Mr. Ward's gender identity and sexual orientation, even if not as troubling as comments considered more facially discriminatory in other contexts. *Cf. Sethi v. Narod*, 12 F. Supp. 3d 505, 541 (E.D.N.Y. 2014) ("You f—king Indian, what do you think about yourself? I will make sure you are sent back to India. You don't know who you are dealing with. You fear my wrath in your dreams."); *O'Diah v. Yogo Oasis,* 954 F. Supp. 2d 261, 272 (S.D.N.Y. 2013) (finding a statement by an individual at the time the plaintiff was fired that, "You Nigerians can't be trusted," "support[s] the inference that [the individual's] decision to terminate [the plaintiff] was motivated by discriminatory animus."); *Richmond v. Gen. Nutrition Cntrs. Inc.,* No. 08–CV–3577, 2011 WL 2493527, at *3, *11 (S.D.N.Y. June 22, 2011) (finding that where the defendant told the plaintiff to "Go back to Africa," criticized his accent, and advised him that he was being demoted because an African should not be in his position, the defendant had made "racially charged comments" supporting the plaintiff's disparate treatment claim). But this factor, weighed in the context of the other factors discussed above and below, does not create a genuine issue of fact on the issue of pretext.

As to the fourth factor, the context in which the remark was made, given that Ms. O'Connell did not make, and could not have made, these comments in connection with the decision to terminate Mr. Ward, as she lacked any decision-making authority in this regard, the weighing of the various *Henry* factors suggests that these comments were stray remarks as opposed to circumstantial evidence of discriminatory intent. *See Sloan v. United Techs. Corp.*, 596 F. App'x 35, 36 (2d Cir. 2015) ("The stray remarks cited by plaintiff were either facially race

16

neutral or too removed from plaintiff's discharge to support an inference of discriminatory causation.") (citing *Henry*, 616 F.3d at 149-50).

Second, as to the alleged comparator, Michael Chidester, there is no record evidence that this person even had a negative unpaid time balance. *See* Exhibit 1 to Exhibit A 4-41, ECF No. 31-1 (business records reflecting that Mr. Chidester never had a negative UPT balance). Thus, no reasonable jury could conclude that Mr. Ward's termination was pretextual for that reason.

Third and finally, on this record, it is undisputed that Mr. Ward had been warned in writing that failure to correct his unpaid time balance could result in termination. Pl.'s SMF ¶¶ 32-35 (admitting that Amazon warned him by email that he may be terminated if he did not resolve his negative UPT balance). Thus, on this record, no reasonable jury could conclude that anything more than the written warnings already provided to him were appropriate here. *See, e.g., Giudice v. Red Robin Int'l, Inc.*, 555 F. App'x 67, 69 (2d Cir. 2014) ("[N]o reasonable factfinder could conclude that it was Giudice's complaint that resulted in his termination, as opposed to Red Robin's stated reason for firing him, which was his failure to properly pay employees after receiving a final warning requiring him to abide by the company's policies concerning the payment of employees.").

Accordingly, having failed to create a genuine issue of material fact as to his gender discrimination claim, Amazon's motion for summary judgment will be granted as to this Title VII claim.

### B.  The Title VII Harassment and Hostile Work Environment Claim

Title VII prohibits an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment'

17

evinces a congressional intent 'to strike at the entire spectrum of disparate treatment . . .,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation omitted).

To establish a hostile work environment under Title VII, "[a] plaintiff must . . . demonstrate that [ ]he was subjected to the hostility because of h[is] membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999), and "that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "In determining whether a plaintiff suffered a hostile work environment, [courts] must consider the totality of the circumstances." *Littlejohn*, 795 F.3d at 321.

Amazon argues that these claims fail because the alleged conduct is not sufficiently severe or pervasive to establish a hostile work environment. Specifically, Amazon argues that Ms. O'Connell's questioning of Mr. Ward's pronouns "amounts to a petty slight or minor annoyance" but is "not actionable hostile work environment harassment." Mot. at 16. Amazon also points to Mr. Ward's concession of Amazon being "a very professional environment" and the fact that neither Ms. O'Connell nor anyone else asked him directly about his sexual orientation. *Id.* at 16-17. Finally, Amazon argues that it is subject to an affirmative defense because (1) "the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

18

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see also Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (hereinafter "*Faragher/Ellerth* defense").

Mr. Ward responds that he has sufficiently proved the elements for his sex and gender harassment claims under Title VII. First, he argues that Ms. O'Connell's "hyper-fixation on [his] relationship with a female co-worker or his chosen pronouns" was unwelcome and offensive. Obj. at 18, 26. Second, he argues that Ms. O'Connell's conduct was motivated, at least in part, by his sex, gender, and sexual orientation. *Id.* at 18, 26-27. Third, he argues that the allegedly discriminatory conduct was sufficiently severe and pervasive because Ms. O'Connell "repeatedly brought it up . . . got Zadrozny to ask [him] . . . went around asking other safety team employees . . . [and] told [Mr. Ward] that members of senior leadership were talking about [his] pronouns." *Id.* at 19. Fourth, he argues that the Defendant is liable for O'Connell's harassment and Amazon's affirmative defense fails because "the supervisor's harassment culminate[d] in a tangible employment action." *Id.* at 20. He also argues that Ms. O'Connell was involved in his termination decision and states that he was "told by a co-worker that O'Connell had gone to HR and told HR not [to] fix [his] time." *Id.* at 20, 6.

Amazon replies that Mr. Ward has not offered any admissible evidence to sustain his claim. Reply at 4. Amazon argues that much of the evidence Mr. Ward puts forth—that his coworker told him that Ms. O'Connell had told HR not to fix his time and that he was told that senior leadership was also talking about his pronouns—is inadmissible hearsay that is unsupported by the record. *Id.* As to Mr. Ward's argument regarding Amazon's *Faragher/Ellerth* defense, Amazon argues that Mr. Ward has not proven that the alleged hostile work environment caused his termination and cannot do so because Ms. O'Connell was not a decisionmaker in his termination. *Id.* at 6. Finally, Amazon argues that once Mr. Ward submitted a complaint a month

19

after his termination, it "took reasonable care to prevent and correct complained-of conduct through its internal complaint procedure, and [Mr. Ward] admittedly and unreasonably failed to take advantage of these preventative and corrective measures during his employment," *id.* at 6.

The Court agrees.

Mr. Ward has failed to create a genuine issue of material fact of being subjected to hostility "because of" his sexual orientation or gender. *Brennan*, 192 F.3d at 319 (recognizing that "[w]hether a work environment is sufficiently abusive to be actionable under Title VII depends on all of the circumstances of a given situation."). A plaintiff can make such a showing "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). As discussed with respect to Mr. Ward's gender discrimination claim, *see supra* Section III.A, however, Ms. O'Connell's remarks constitute neither direct evidence of discrimination nor circumstantial evidence of discriminatory intent, and Mr. Ward has failed to identify an apt comparator to give rise to a plausible inference of discrimination. *See Littlejohn*, 795 F.3d at 312 (An inference of discrimination can be shown by "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." (citation and internal quotation marks omitted)).

Even if he were able to create a genuine issue of material fact as to causation, Mr. Ward has failed to create a genuine issue of material fact that Ms. O'Connell's actions were "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 320-21. "This standard has both objective and subjective

components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22); see also *Harris*, 510 U.S. at 23 (in determining whether a plaintiff established there was a hostile work environment, courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.").

As to the objective component, Ms. O'Connell's conduct is not sufficiently severe or pervasive to create a hostile work environment, since "a mere utterance . . . which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (internal quotation marks and citation omitted); *see Daniel v. T & M Prot. Res. LLC*, 87 F.Supp.3d 621, 639 (S.D.N.Y. 2015) (holding that, although plaintiff's testimony indicates that he was mistreated based in part on his race, perceived national origin, and perceived sexual orientation . . . this "mistreatment does not rise to the level of 'severe or pervasive' harassment so as to create a 'hostile or abusive' work environment.") (citations omitted); *see also Estevez v. Berkeley Coll.*, No. 21-1988, 2022 WL 16843460, at *1 (2d Cir. Nov. 10, 2022) ("[A] female co-worker staring and frequently making backhanded compliments about the Employees' clothes, bodies, and appearances, a male co-worker frequently commenting that there was too much estrogen in the room, and a male supervisor making a single comment arguably evidencing a bias against working mothers — is not sufficiently severe or pervasive to support a hostile-work-environment claim.") (citing *Redd*, 678 F.3d at 176).

In the absence of a genuine issue of material fact as to conduct based on Mr. Ward's gender and/or sexual orientation or conduct sufficiently severe or pervasive to establish a hostile work environment, Amazon is entitled to summary judgment on these claims.[2] *Tassy v. Buttigieg*, 51 F.4th 521, 535 (2d Cir. 2022) (affirming district court's finding that defendant was entitled to summary judgment on plaintiff's hostile work environment claim because the plaintiff could not show that the conduct was on account of his protected characteristics, and therefore declining to address whether the conduct was sufficiently pervasive or severe); *Rider v. Town of Farmington*, 162 F. Supp. 2d 45, 52 (D. Conn. 2001) ("Rider has provided no evidence that would suggest that any of the actions she complains of were taken because of her gender. Therefore, no genuine issue of material fact exists as to the presence of a hostile work environment based on gender, and the defendants are entitled to summary judgment on the hostile work environment theory of the Title VII claim set forth in the First Count.").

Accordingly, Amazon's motion for summary judgment will be granted as to the Title VII harassment and hostile work environment claim.

### C.  The Title VII Retaliation Claim

The *McDonnell Douglas* burden-shifting framework governs Title VII discriminatory retaliation claims. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases."). To establish a *prima facie* case of retaliation, Plaintiff must prove: "(1) [he] engaged in protected activity, (2) the defendant was aware of that activity, (3) [he] was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there

---

[2] The Court thus need not determine whether Amazon is entitled to the *Faragher/Ellerth* defense. Suffice it to say, there is no record evidence that Mr. Ward "[took] advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. New York City Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).

Amazon argues that Mr. Ward cannot establish the last two elements of a *prima facie* case of retaliation. Amazon characterizes the protected activity for the purposes of this claim as Mr. Ward's post-termination complaint, in which he did not seek re-employment. Mot. at 19. Amazon thus argues that its decision not to rehire Mr. Ward is not an adverse or retaliatory action. *Id.* at 20. Amazon also argues that Mr. Ward cannot establish the necessary causal link, since the reasons for his termination were unrelated to Ms. O'Connell's alleged conduct. Assuming Mr. Ward could establish a *prima facie* case, Amazon argues that Mr. Ward cannot show that Amazon's non-discriminatory reason for his termination was pretextual. *Id.* at 22.

Mr. Ward argues that the legally protected activity central to his retaliation claim is not his post-termination complaint, but his request to Ms. O'Connell that she stop asking about his alleged relationship with his co-worker. Obj. at 21. He argues that he attempted to be rehired by internally appealing the termination decision, during which he complained about Ms. O'Connell's remarks. *Id.* He argues that both Ms. O'Connell and Amazon were aware of his complaints, that the termination and failure to re-hire him were both materially adverse actions, and that a causal connection exists between his opposition to Ms. O'Connell's comments and the materially adverse actions to which he was subject. *Id.* at 21-24.

Amazon responds that absent a showing that a decisionmaker had knowledge of the protected activity, which Ms. O'Connell did not, no causal connection could be established between Mr. Ward's complaints and his termination. Reply at 6-7. Amazon also argues that a claim of retaliation based on its decision not to re-hire Mr. Ward fails for three reasons. First, because Ms. O'Connell was not a decisionmaker, no causal connection exists. *Id.* at 7. Second,

23

Mr. Ward's internal appeal did not include any allegations of discrimination; his internal complaint of discrimination was only submitted two weeks after his appeal had been fully adjudicated. *Id.* Thus, "it is impossible that Amazon failed to rehire him through the appeal process in retaliation for protected activity that had not yet occurred." *Id.* Third, Amazon notes that Mr. Ward never applied for reinstatement following the adjudication of his appeal, and he therefore "cannot establish that Amazon took any adverse action toward him by not unilaterally rehiring him after he filed his post-termination, post-appeal complaint." *Id.* at 8.

The Court agrees.

As discussed above, there is no record evidence that Ms. O'Connell played a role in the decision to terminate Mr. Ward. *See* Depo. of Jaime Guzman, ECF No. 28-6 at 11 ("Guzman Depo.") (stating that Mr. Guzman did not make the decision himself to terminate Mr. Ward. Rather, the decision was made in coordination with the site HR manager, the regional safety manager, and safety HR); *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir. 1994) ("To defeat a motion for summary judgment[,] a plaintiff cannot rely on 'conjecture or surmise.'") (citation omitted); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985) ("[T]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."). And when informed about the decision to terminate him, she expressed a desire to retain, rather than terminate, his employment. Pl.'s SMF ¶ 37 ("[A]fter HR alerted O'Connell Plaintiff's employment would be terminated for negative UPT, O'Connell messaged HR, writing: 'I vote for final written' instead of termination."). Mr. Ward's failure to rehire theory also fails because Amazon was not aware of Mr. Ward's protected activity until his appeal had been fully adjudicated. *See* Guzman Depo. at 24 (stating

24

that Mr. Guzman was not aware of the conflict between Mr. Ward and Ms. O'Connell at the time he, along with the other decisionmakers, decided to terminate him).

Even assuming *arguendo* that Mr. Ward could establish a *prima facie* case of retaliation, his claims nonetheless fail under the *McDonnell Douglas* burden-shifting framework. If a plaintiff satisfies the initial burden at the prima facie stage, "a presumption of retaliation arises" that the defendant may rebut by "articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164–65 (2d Cir. 2010) (citation omitted). The employee must then show "that retaliation was a substantial reason for the adverse employment action." *Hicks*, 593 F.3d at 165. A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Id.* at 164–65 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

Amazon has stated a legitimate, non-retaliatory reason for Mr. Ward's termination: his negative UPT balance. There is no record evidence that any complaint raised by Mr. Ward to Ms. O'Connell or anyone else resulted in his termination, and there is no genuine issue of fact that any retaliatory motive played a part in his termination, or Amazon's subsequent decision not to rehire him. As discussed above, Ms. O'Connell was not involved in the decision to terminate Mr. Ward, and she later indicated her preference not to terminate him. Mr. Ward thus cannot establish that retaliatory animus motivated the initial termination decision.

As to Amazon's alleged failure to rehire him, while Mr. Ward did seek reinstatement as part of the internal grievance process, *see* Ward Appeal, ECF No. 24-17 at 5 ("I wish to be fully reinstated as an OMR"), there is no record evidence that anyone adjudicating his appeal and

post-termination complaint knew of Ms. O'Connell's comments. *See id.* at 2-5 (failing to identify the allegedly discriminatory conduct or his protected activity in his appeal); *see also* Plaintiff Complaint, ECF No. 24-20 (claiming retaliation by Ms. O'Connell, but not on the basis of his gender identity or sexual orientation). At this stage of this case, Mr. Ward "must come forward with at least some credible evidence that the actions of the [defendants] were motivated by [ ... ] animus or ill-will." *Grillo v. New York City Transit Auth.,* 291 F.3d 231, 234 (2d Cir. 2002).

Although Mr. Ward can point to the temporal proximity between his protected action (complaining to Ms. O'Connell and his post-termination complaint) and the materially adverse employment decisions (his termination and alleged failure to rehire), at this stage of the proceeding, this temporal proximity alone will not suffice. *Butler v. New York Health & Racquet Club*, 768 F. Supp. 2d 516, 529 (S.D.N.Y. 2011) ("[T]emporal proximity, without more, 'is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext.'") (citing *Simpson v. N.Y. State Dep't of Civil Serv.,* 166 Fed.Appx. 499, 502 (2d Cir. 2006)).

Accordingly, in the absence of a genuine issue of material fact as to Mr. Ward's Title VII retaliation claim, Amazon's motion for summary judgment will be granted with respect to this claim.

### D.  The Remaining State Law Claims

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "[D]istrict courts may decline to exercise supplemental jurisdiction over a claim," however, if "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3).

26

The exercise of supplemental or pendent jurisdiction is "a doctrine of discretion," not of "right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* But as the Second Circuit recently emphasized, "[t]he principle that the elimination of federal-law claims prior to trial generally points to declining to exercise supplemental jurisdiction 'in the usual case' clearly does not mean that the balance of the factors always points that way." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 86 (2d Cir. 2018). Thus, "[w]hen § 1367(c)(3) applies, the district court must still meaningfully balance the supplemental jurisdiction factors" of judicial economy, convenience, fairness, and comity before declining to exercise supplemental jurisdiction. *Id.*

Because the Court "has dismissed all claims over which it has original jurisdiction," it must decide whether to "decline to exercise supplemental jurisdiction" over Mr. Ward's state law claims. 28 U.S.C. § 1367(c). Here, after balancing the factors set forth in *Gibbs* and *Cohill*, the Court will decline to retain supplemental jurisdiction. Mr. Ward's remaining claims under CFEPA raise quintessential questions of state law, and dismissal without prejudice with respect to these claims "will procure for the parties 'a surer-footed reading of applicable law'." *Klein & Co. Futures v. Bd. of Trade of N.Y.C.*, 464 F.3d 255, 263 n.5 (2d Cir. 2006) (quoting *Gibbs*, 383 U.S. at 726).

27

Accordingly, the Court will not exercise supplemental jurisdiction over Mr. Ward's remaining state law claims, and these claims will be dismissed without prejudice to refiling in state court.

## IV.    CONCLUSION

For the foregoing reasons, Amazon's motion for summary judgment is **GRANTED**.

The Title VII claims are dismissed with prejudice, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims, dismissing them without prejudice to refiling in state court.

The Clerk of Court is respectfully directed to enter judgment for the Defendant and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 22nd day of May, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE